IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MILLER & SON PAVING, INC.,** | : | |
| Appellant, | : | **CIVIL ACTION** |
| | : | |
| v. | : | No. 15-4869 |
| | : | |
| **TEAMSTERS PENSION TRUST FUND OF** | : | |
| **PHILADELPHIA AND VICINITY,** | : | |
| Appellee. | : | |

**MCHUGH, J.**                                                                     **SEPTEMBER 14, 2016**

**MEMORANDUM**

This is an ERISA case involving an employer's obligation to fund future liabilities when withdrawing from a pension plan. The employer has appealed an arbitrator's opinion and award, challenging the method of calculating its liability when it withdrew from a multiemployer pension plan. Because I find that the employer's withdrawal liability was calculated under a reasonable interpretation of the plan and its supplementary documents, I affirm the arbitrator's opinion and award.

**I.**     **Background on the Parties and Withdrawal Liability**

Appellee (the Fund) is a jointly administered multiemployee pension benefit plan within the meaning of the Employee Retirement Income Security Act of 1874 (ERISA), 29 U.S.C. §§ 1001–1461, and the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *id.* §§ 1381–1461. Appellant (Miller) is a Pennsylvania corporation that contributed to the Fund pursuant to a number of collective bargaining agreements to which Miller was a party. On or about December 31, 2011, Miller ceased its operations covered by the Fund and effected a "complete withdrawal" from the Fund within the

1

meaning of the MPPAA, *id.* § 1383(a)(2). The Fund determined that Miller had incurred withdrawal liability[1] of $1,487,097.71. Miller challenged the assessment of liability—claiming it should have been reduced to $601,634—and submitted a Demand for Arbitration. An evidentiary hearing was held before an arbitrator, Mariann Schick, Esq., and she issued an Opinion and Award on July 30, 2015, approving the Fund's calculation of withdrawal liability.

---

[1] Writing for the Seventh Circuit, Judge Posner has provided this helpful background on withdrawal liability:

> Multiemployer pension plans—which are governed, as single-employer plans are, by ERISA—are created by collective bargaining agreements to provide benefits to employees of many different firms. Thus they are found in industries such as construction and trucking in which workers do short-term, seasonal, or irregular work for many different employers over their working lives. When an employer withdraws from such a plan, the plan remains liable to the employees who have vested pension rights, though it no longer can look to the employer to contribute additional funds to cover these obligations.
> In an effort to prevent withdrawals that will shift the burden of funding the pension plan to the remaining employers and by doing so may precipitate additional withdrawals, provisions added to ERISA by the [MPPAA] assess the employer with an exit price equal to its pro rata share of the pension plan's funding shortfall. The shortfall ("unfunded vested benefits") is the difference between the present value of the pension fund's assets and the present value of its future obligations to employees covered by the pension plan. 29 U.S.C. §§ 1381, 1391. (If the present value of the assets exceeds the present value of the plan's future obligations, there is no shortfall.)
> Estimation of the shortfall depends critically on estimating the amount by which the fund's current assets can be expected to grow by the miracle of compound interest. The higher the estimated rate of growth, the less the employers must put into the fund today to cover the future entitlements of the plan's participants and beneficiaries. "[F]or a typical plan, a change (upward or downward) of 1 percent in the interest assumption (e.g. an increase from 6 to 7 percent) alters the long-run cost estimate by about 25 percent."
> In addition to estimating the size of the plan's funding shortfall, the pension plan must apportion responsibility for the shortfall among the employers participating in the plan. Each employer must pay his share to the fund if and when he withdraws, so that the plan can pay the employer's share of the plan's unfunded vested benefits as those benefits come due in the future. . . .
> . . . .
> Estimating the growth of the fund's assets is required not only for determining withdrawal liability but also for determining whether employers are contributing to the fund the minimum amount required by ERISA in order to reduce the probability that the Pension Benefit Guaranty Corporation may have to make up for the fund's not being able to pay vested benefits; for the Corporation is the insurer of those benefits, though only to a limited extent.

*Chi. Truck Drivers v. CPC Logistics, Inc.*, 698 F.3d 346, 347–48, 353 (7th Cir. 2012) (some citations omitted).

**II.     The Arbitration**

ERISA provides that "[e]very employer benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The plan's fiduciary must act "in accordance with the documents and instruments governing the plan insofar as" they are consistent with ERISA. *Id.* § 1104(a)(1)(D).

This case turns on the Fund's calculation of Miller's withdrawal liability pursuant to Article IX, Section C (Section C) of the Teamsters Pension Plan of Philadelphia and Vicinity (the Plan), which provides in relevant part:

> In accordance with the advice of the Trust Fund's enrolled actuary, the actuarial assumptions used in calculating withdrawal liability shall be the same actuarial assumptions used in determining the Trust Fund's minimum funding standards under the Internal Revenue Code.

The record presented to the Arbitrator shows that the Fund calculated the relevant figures as follows. In evaluating the needs of the Plan, during the years 2000 to 2008, the Fund used a 7.5% interest rate, called a "valuation rate," to calculate both minimum funding standards and withdrawal liability. In 2009, however, the Fund began to calculate minimum funding standards using a second interest rate assumption—the "current liability rate"—in combination with the 7.5% valuation rate. The Fund used these two rates in tandem to create a range of values to select from in setting its minimum funding standards. In 2011, the year the Fund calculated Miller's withdrawal liability, the current liability rate was 4.47%.

At the same time, the Fund also began to calculate withdrawal liability differently. The Fund began to use a "blended rate"—a particular application of both the 7.5% valuation rate and the 4.47% current liability rate—to determine the present value of vested benefits for withdrawal liability purposes. Ex. J-1(G) at 40. The Fund valued the

funded portion of the benefits at the valuation rate of 7.5%, and the unfunded portion at the current liability rate of 4.47%.  Ex. J-1(G) at 40.  The Fund's actuary testified that the Fund began using the blended rate "[b]ecause the plan wasn't healthy, and we decided to use something to increase the liabilities of the plan to protect the plan."  Hr'g Tr. (H.T.) 91:18–23.

In the arbitration, Miller argued that use of the blended rate in calculating withdrawal liability violated the plain language of Section C, because although both the 7.5% valuation rate and the 4.47% current liability rate were used individually in calculating minimum funding standards, the blended rate was not.  By Miller's reasoning, the "same actuarial assumptions" were not used in calculating both minimum funding standards and withdrawal liability.  The Fund, in response, argued that Section C only requires that the same *actuarial assumptions* be used, and does not require that those assumptions be used *in the same way* in each calculation.  Thus by using the same actuarial assumptions—the 7.5% valuation rate and the 4.47% current liability rate—the Fund complied with Section C.

The Arbitrator agreed with the Fund, concluding that Section C did not prevent the Fund from using the blended rate to calculate withdrawal liability.  She first recognized that the Plan gives the Fund's Trustees the authority

> [t]o construe, in their sole and exclusive discretion, the terms and provisions of this Declaration of Trust, the Pension Plan, and all other supplementary and amendatory documents, and the construction adopted by the Trustees in good faith shall be binding upon the Employers, the Union, the Employes, and any beneficiaries.

Ex. J-1(F) at 11 (some capitalization omitted).  The Arbitrator also noted that "any ambiguity in the language must be construed against Miller."  Op. 14 (citing *Fleisher v.*

4

*Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012)).  She agreed with the Fund that "the decision of the Trustees regarding the interpretation of their pension plan documents must be followed, unless such interpretation is arbitrary and capricious."  Op. 14.

The Arbitrator further reasoned that, in requiring use of the "same actuarial assumptions" to calculate both minimum funding standards and withdrawal liability, Section C did not require that these assumptions "be used *in the same way*" in making each set of calculations.  Op. 22.  She thus credited the Fund's actuary's testimony that by treating the valuation rate assumption and the current liability rate assumption individually for minimum funding purposes and blending them for withdrawal liability purposes, the Fund used the same actuarial assumptions in making each set of calculations.  Op. 15, 20–23.  She ultimately concluded that the Fund's interpretation of Section C complied with its language and was not arbitrary and capricious, and upheld the Fund's calculation of withdrawal liability.  Op. 20–23.

Miller subsequently filed this action pursuant to 29 U.S.C. §§ 1401(b)(2) & 1451(c), requesting that this Court vacate that portion of the Arbitrator's Opinion and Award.[2]  The parties have now filed cross-motions for summary judgment.

### III.    Standard of Review

Motions for summary judgment are governed by the well-established test set forth in Federal Rule of Civil Procedure 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), but particular rules apply in this context.  In reviewing an arbitrator's decision under ERISA, "the district court presumes that the arbitrator's factual findings are correct unless they are rebutted by a clear preponderance of the

---

[2] In the arbitration, Miller also challenged the calculation of the Fund's assets on the date of withdrawal and the Fund's assessment of interest on quarterly payments, but Miller is not challenging the Opinion and Award on those issues in this action.  *See* Miller Br. 2–3.

evidence," while "[t]he arbitrator's legal conclusions are reviewed *de novo*." *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992). A "district court may not vacate an arbitration award merely because it would decide the merits differently. So long as the arbitration award has some support in the record, and the arbitrator has not manifestly disregarded the law, [the district court] will affirm the award." *Eichleay Corp. v. Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers*, 944 F.2d 1047, 1057 (3d Cir. 1991) (citation omitted).

Similarly, when a plan's trustees act under their authority to interpret a plan's terms, the district court reviews the trustees' interpretation under the arbitrary and capricious standard, and "the trustees' interpretation 'should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan.'" *Moats v. United Mine Workers of Am. Health & Retirement Funds*, 981 F.2d 685, 687–88 (3d Cir. 1992) (Alito, J.) (quoting *Gaines v. Amalgamated Ins. Fund*, 753 F.2d 288, 289 (3d Cir. 1985)).

### IV.   Discussion

#### A.   The Arbitration Award

Section C of the plan relevantly provides,

> In accordance with the advice of the Trust Fund's enrolled actuary, the actuarial assumptions used in calculating withdrawal liability shall be the same actuarial assumptions used in determining the Trust Fund's minimum funding standards under the Internal Revenue Code.

Miller offers two main arguments on appeal. First, Miller argues that the Arbitrator gave too much deference to the Fund's interpretation of the words "same actuarial assumptions used." Specifically, Miller argues that deference to the Fund's interpretation of the Plan is not warranted if that interpretation is inconsistent with

6

unambiguous Plan language. Br. 10–12.  Going further, Miller claims that "same actuarial assumptions used" is unambiguous, and therefore the Arbitrator erred in "ignor[ing]" this threshold question.  Br. 10–12.

Second, Miller argues that the Fund's interpretation of "same actuarial assumptions used" is contrary to a plain reading.  Miller's argument for why the Fund ran afoul of Section C is appealingly simple:  The Fund used the blended rate in calculating withdrawal liability but did not use the blended rate in calculating minimum funding standards.  Miller claims that one of two things must be true:  either the blended rate is itself an actuarial assumption, or the words "same actuarial assumptions used" require that the two separate actuarial assumptions of the 7.5% valuation rate and the 4.47% current liability rate be *used in the same way* in making each set of calculations.  Under either view, according to Miller, the Fund used different actuarial assumptions in making each set of calculations, violating the Plan.  Br. 15–22.

I reject both arguments because I find that Section C *is* ambiguous and that the Fund's interpretation of Section C is rationally related to a valid Plan purpose.

1. *Ambiguity*

It is true that the Arbitrator passed quickly over the question whether Section C is ambiguous and therefore open to multiple interpretations.  But because the determination "whether a contract term is clear or ambiguous is a question of law for the court," *Einhorn v. Fleming Foods of Pa., Inc.*, 258 F.3d 192, 194 (3d Cir. 2001), I consider the question now.

"A term is ambiguous if it is susceptible to reasonable alternative interpretations." *Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999).

The only issue then is whether Section C's requirement—that the actuarial assumptions used in making a first set of calculations be the "same actuarial assumptions used" in making a second set—can reasonably be interpreted to include the use of two different interest rates *individually* in the first set, but a *blend* of those two rates in the second set. I take each term in turn.

First, the word "same," in its common usage, means "something identical with or similar to another." *Webster's Third New International Dictionary* 2007 (1993). Second, as the Fund's actuary testified, an "actuarial assumption" is an estimate of the present value of future variables, such as employee retirement, mortality, and turnover rates—and interest rates. H.T. 106:3–10; *see also Mead Corp. v. Tilley*, 490 U.S. 714, 717 (1989) ("actuarial assumptions" include "such things as employee turnover, mortality rates, compensation increases, and the rate of return on invested plan assets"). Third, "used" means "put into action or service." *Webster's Third*, *supra*, at 2523.[3]

Using these ordinary definitions, I find that, by using the blended rate to calculate withdrawal liability but separate individual rates to calculate minimum funding standards, the Fund complied with a reasonable interpretation of Section C. In each set of calculations, the Fund applied a 7.5% valuation rate and a 4.47% current liability rate.

---

[3] Miller relies on *Merriam–Webster's Collegiate Dictionary* for its claim that the crux of the dispute lies in competing interpretations of the word "same": "The word *same* as used here has only *one* reasonable meaning, and that is [(1)] 'something identical with' or 'similar to another'; [(2)] 'resembling in relevant aspect'; or [(3)] 'corresponding so closely as to be indistinguishable.'" Br. 12 (second emphasis added). But neither the Fund nor the Arbitrator disputes this interpretation of "same." *See* Fund Br. 8 (showing that the Fund "used *two* different interest rate assumptions (4.47% and 7.5%) to determine the Fund's minimum funding standards," and then "*blended* (and thus used) those *same two* interest rates to calculate . . . withdrawal liability"); Op. 21–22 ("[O]ne set of interest rates cannot be used for the calculations involved with withdrawal liability, while another set is used for the calculation of the minimum funding standard. Indeed, the actuarial report demonstrates that the interest rates used in withdrawal liability were in fact the same ones used in determining the minimum funding standard."). Rather, the root of the dispute is whether Section C unambiguously requires that these actuarial assumptions be used in the same way in making each set of calculations. As I show below, it does not.

The Fund thus (1) put into action or service (2) identical (3) interest rates—or, in other words, (1) used (2) the same (3) actuarial assumptions.  The only distinction is that the Fund used these two rates differently in each set.  Miller seizes on this, claiming that "[o]f course" Section C "require[s] that the *ways* in which [the assumptions] are used in both calculations be identical."  Br. 16 (emphasis added).  On its face, however, Section C contains no such requirement, and Miller's characterization of it is wholly conclusory and devoid of any supporting analysis or authority.

Most importantly, it is reasonable to interpret the Fund's actuary's report[4] to mean that the blended rate is not actually an assumption in and of itself, but rather a particular *method of applying other assumptions*.  Specifically, the blended rate is an application of the 7.5% valuation rate to the funded part of the Fund's vested benefits and the 4.47% current liability rate to the unfunded part of those benefits.  Ex. J-1(G) at 40.  This is permitted under a reasonable interpretation of Section C, which requires only that the Fund calculate withdrawal liability under the "same actuarial assumptions used" to calculate minimum funding standards.  The Plan's drafters could have explicitly required that not only must the same actuarial assumptions be used, but that the same *methods of applying* those assumptions be used as well.  Such a model is exemplified by 29 U.S.C. § 1393(a)(1), which requires that withdrawal liability be determined based on reasonable "actuarial assumptions *and methods*" (emphasis added); *see also Elbeco Inc. v. Nat'l Retirement Fund*, 128 F. Supp. 3d 849, 860–61 (E.D. Pa. 2015) (recognizing the distinction between actuarial assumptions and the methodology used to calculate

---

[4] As noted earlier, Article IV, Section 1(s) of the Plan gives the Trustees the power to "construe, in their sole and exclusive discretion, the terms and provisions of . . . the Pension Plan, and all other supplementary and amendatory documents, and the construction adopted by the Trustees in good faith shall be binding upon the Employer" (some capitalization omitted).

withdrawal liability).  The Plan's drafters did not so specify.  I therefore find that Section C is amenable to more than one interpretation and can reasonably be read to permit use of the blended rate to calculate withdrawal liability but not to calculate minimum funding standards.[5]

2. *Rationally Related to a Valid Plan Purpose*

While arbitrary and capricious review of trustees' interpretation of a pension plan is not searching, it is not enough that a Plan contain ambiguous language.  The trustees' interpretation of that language must also be "rationally related to a valid plan purpose." *Moats*, 981 F.2d at 688.  I agree with the Arbitrator that the Fund's use of the blended rate under its interpretation of Section C furthered the valid goal of ensuring the Fund could meet its future obligations to its members.

ERISA was designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986).  "The purposes behind ERISA and the MPPAA" are to "ensur[e] that pension funds will be adequately funded, even when employers withdraw from them, and that the employees who are relying on those funds will be protected." *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 194 (3d Cir. 2009).  For these reasons, ERISA requires that withdrawal

---

[5] It is true, as Miller points out, that the Fund's actuary's report contains the following: "For purposes of determining the present value of vested benefits for withdrawal liability, the *same actuarial assumptions are used* in the valuation for plan funding *with the exception of the assumed rate of investment return which is a blend* of interest assumptions for current liability (4.47%) and plan funding assumptions (7.50%)."  Ex. J-1(G) at 40 (emphases added).  It is possible to read this to mean that the blended rate is itself an actuarial assumption.  But I need not—and indeed cannot—decide whether the Fund's contrary interpretation of the Plan and the actuary's report is correct.  *See Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir. 1997) ("arbitrary and capricious review" means "a fiduciary's interpretation of a plan will not be disturbed if reasonable").  I find only that it was reasonable and made in good faith.

10

liability be determined on the basis of "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1).

The Arbitrator found that the Fund had a clear and valid purpose in using the blended rate to calculate withdrawal liability: shoring up an economically unhealthy Fund. Through 2008, the Fund had calculated minimum funding standards and withdrawal liability using the 7.5% valuation rate. But the Fund had lost significant assets because of the 2008–2009 economic recession, leaving a greater percentage of the Fund's vested benefits unfunded. As the Fund's actuary testified, "[T]he plan wasn't healthy, and we decided to use something to increase the liabilities of the plan to protect the plan." H.T. 91:18–23. That "something" was using the blended rate to calculate withdrawal liability, which works by calculating the *funded* part of vested benefits using the 7.5% valuation rate and the *unfunded* part using the 4.47% current liability rate. Ex. J-1(G) at 40. As the Arbitrator recognized, because "[l]iabilities owed vary inversely with the interest rate," using the blended rate "produce[d] a greater contribution to the unfunded liability than would be produced by a straight 7.5% interest rate." Op. 23.

I find the Fund's use of the blended rate to calculate withdrawal liability consistent with ERISA's goal of ensuring that the Fund has adequate funds to pay out vested benefits to its members. As the Arbitrator found, if after 2008 the Fund had continued to use a 7.5% valuation rate to calculate withdrawal liability, this would "have been going against its best estimate of what interest rate calculation would best serve a fund in an unhealthy status." Op. 22. This would have been inconsistent with ERISA's

11

requirement that withdrawal liability be based on assumptions that "offer the actuary's best estimate of anticipated experience under the plan."  I therefore find the Fund's decision consistent with the valid purpose of ensuring the economic health of the Plan.[6]  *Cf. Moats*, 981 F.2d at 688 ("[T]he Trustees' decision was rationally related to a valid plan purpose—namely, the preservation of Plan resources . . . .").

The Arbitrator's Opinion and Award is affirmed.

### B.     Attorney's Fees

The Fund seeks attorney's fees as the prevailing party.  In an MPPAA action, "the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party."  29 U.S.C. § 1451(e).  The Court of Appeals has held that in exercising its discretion to grant or deny fees, a district court must consider "(1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorney's fees; (3) the deterrent effect of an award of attorney's fees; (4) the benefit conferred upon members of the pension plan as a whole; and (5) the relative merits of the parties' positions." *Templin v. Independence Blue Cross*, 785 F.3d 861, 867 (3d Cir. 2015) (citing *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983)).

---

[6] Miller halfheartedly relies on the Seventh Circuit's decision in *Chicago Truck Drivers* for the proposition that using different rates to calculate minimum funding standards and withdrawal liability is an impermissible "manipulation" that penalizes withdrawing employers.  Br. 20.  But the holding of *Chicago Truck Drivers* does not apply here.  In that case, the fund's trustees directed its actuary to use an interest rate *higher* than the actuary's best estimate to calculate withdrawal liability—resulting in *lower* withdrawal liability for employers.  698 F.3d at 354–55.  The trustees did this solely because of the "trustees' desire to attract employers to the fund by manipulating withdrawal liability." *Id.* at 356.  This directly violated ERISA's requirement that withdrawal liability be calculated based on "the actuary's best estimate of anticipated experience under the plan."  29 U.S.C. § 1393(a)(1).  Miller has presented no evidence that its withdrawal liability was based on anything other than the Fund's actuary's best estimate of anticipated experience under the Plan, the opposite of what occurred in *Chicago Truck Drivers*.

12

The first factor, Miller's culpability or bad faith, weighs against awarding fees. The issues here are complex enough and subtle enough, and the amount at issue great enough, that Miller did not act in bad faith in taking this appeal. The Fund appears to base its claim for fees principally upon Miller's lack of response to its argument that ERISA indisputably gives sole discretion to a pension plan's actuary in cases such as this. I am not persuaded that this argument, which I found no need to reach, is necessarily as irrefutable as the Fund would suppose. *See also McPherson v. Emps.' Pension Plan of Am. Re-Ins. Co.*, 33 F.3d 253, 257 (3d Cir. 1994) ("A party is not culpable merely because it has taken a position that did not prevail in litigation.").

The fifth factor, the relative merits of Miller's and the Fund's positions, neither weighs in favor of awarding nor denying fees. While the Fund carried the day, it had the benefit of arbitrary and capricious review. And I do not agree with the Fund that "Miller has no conceivable basis for describing the Fund's position as 'arbitrary and capricious.'" Fund Br. 24. Indeed, Miller's arguments were grounded in a reasonable interpretation of Section C. *See, e.g.*, *supra* note 5. Like Judge Gardner, "I am ultimately guided by the fact that in the cases where defendants have been granted attorneys' fees and costs, the lack of *any* merit was clear." *Estate of Schwing v. Lilly Health Plan*, 898 F. Supp. 2d 759, 772 (E.D. Pa. 2012) (emphasis added) (citing *Monkelis v. Mobay Chem.*, 827 F.2d 935, 936 (3d Cir. 1987); *Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480, 497 (D. Del. 1998)). This is not such a case.

As to the second, third, and fourth factors, neither party has briefed those issues. I therefore decline to find that any of those factors weighs in favor of awarding or denying

fees.  *See Haybarger v. Lawrence Cnty. Adult Probation & Parole*, 667 F.3d 408, 413 n.3 (3d Cir. 2012) ("We ordinarily do not address issues that the parties have not briefed.").

Because I find the first factor weighs against awarding fees and none of the other factors weighs for or against, I deny the Fund's claim for attorney's fees.

### V. Conclusion

Miller's Motion for Summary Judgment is denied.  The Fund's Motion for Summary Judgment is denied as to its request for attorney's fees, but granted in all other respects.  An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge
